**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF CHICAGO, a municipal | ) |
| corporation, and SUPERINTENDENT | ) |
| LARRY SNELLING, former FIRST | )    Case No. 25-cv-15022 |
| DEPUTY SUPERINTENDENT YOLANDA | ) |
| TALLEY, CHIEF OF CONSTITUTIONAL | ) |
| POLICING AND REFORM ANGEL | ) |
| NOVALEZ, CHIEF OF DETECTIVES | )    <u>Jury Trial Demanded</u> |
| ANTOINETTE URSITTI, and | ) |
| COMMANDER ARLESEUIA WATSON, | ) |
| all in their individual capacities, | ) |
| | ) |
| Defendants. | ) |

## <u>COMPLAINT</u>

Plaintiff, Jane Doe, by and through her attorneys, O'Malley & Madden, P.C., complains of

Defendants, City of Chicago, a municipal corporation, Superintendent Larry Snelling, former First

Deputy Superintendent Yolanda Talley, Chief of Constitutional Policing and Reform Angel

Novalez, Chief of Detectives Antoinette Ursitti, and Commander Arleseuia Watson, in their

individual capacities, as follows.

## <u>NATURE OF THE ACTION</u>

1.      This action is brought to remedy serious harm suffered by Plaintiff, Detective Jane

Doe ("Doe"), on account of Defendants' abject disregard for her rights, including for her physical

safety. Doe served as a detective for the Chicago Police Department ("CPD") on one of its

prestigious Homicide Teams and performed exceptional work. However, while working as a

Homicide detective, Doe suffered extreme abuse at the hands of her coworker, another Chicago

police detective, Marco Torres ("Torres"). Torres repeatedly physically, mentally, and sexually abused Doe, causing her both significant physical harm and severe emotional distress. When she protested his abuse, pleaded with him to stop, and tried to cut ties with him altogether, he only escalated his abuse and threatened to kill her and kill himself, making certain threats of fatal violence from his CPD e-mail address. When Doe formally reported Torres to the CPD's Bureau of Internal Affairs ("BIA"), the City invoked its Code of Silence and chose to punish her, including by removing her from her prestigious role on the Homicide Team, while protecting Torres and shielding him from any consequence. Through her counsel, Doe expressly informed several high-ranking CPD officials, including then-Chief of BIA, Yolanda Talley, of Torres's abuse and threats and shared documentation with them. The City took no action whatsoever – it did not investigate, it did not remove Marco Torres from his unit of assignment, it did not send Torres for a fitness for duty evaluation, and it did not impose any discipline on Torres at all. Instead, the City allowed Torres to remain a CPD officer with a firearm, notwithstanding his threats to kill Doe.

2.      After Doe filed a Charge of Discrimination with the Equal Employment Opportunity Commission and a civil Complaint in the Circuit Court of Cook County, Torres's unlawful conduct toward Doe continued and escalated, and the City continued to refuse to subject him to any discipline. Torres remained a threat to Jane Doe, repeatedly attempted to obtain her home address, and texted another CPD officer saying he needed Doe's address because he had spoken to a gang member who wanted a "grand" to "get rid of her." In retaliation for her continued complaints, the City did not even tell Doe about this grave threat, intentionally placing her in danger of being killed. Even after Torres was charged with assault and battery by the Cook County State's Attorney, and even after he was convicted of threatening to kill Doe, the City still took no action against Torres. Instead, Defendants continued to conspire to deprive Doe of her

2

constitutional rights to equal protection and due process of law. The City's actions in protecting Torres are part of its well-documented and long-recognized Code of Silence that operates to protect bad actors amongst its ranks and punish the whistleblowers who report their misconduct. Torres's actions, which have been condoned and encouraged by the City and its policymakers, are consistent with, and in furtherance of, CPD's pattern and practice of condoning violent misogyny from male officers and refusing to protect female victims of gender violence. Doe has been significantly harmed, and continues to be harmed, by the City of Chicago, its police department, and its policymakers, who have acted together to give cover to violent police officers, including Marco Torres, at the expense of victims, citizens, and taxpayers.

## JURISDICTION AND VENUE

3.      Jurisdiction is provided by 28 U.S.C. § 1331, 42 U.S.C. § 1983, 42 U.S.C. § 2000e *et seq*., and 28 U.S.C. §§ 1331 and 1443, as this matter alleges that Doe has been deprived of rights guaranteed to her under the Constitution of the United States of America as well as the Civil Rights Act of 1964, as amended.

4.      The Court has supplemental jurisdiction over Doe's state law claims pursuant to 28 U.S.C. § 1367(a).

5.      This action properly lies in this district pursuant to 28 U.S.C. § 1391(b) because a Defendant resides in this judicial district and because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

6.      Doe has complied with all administrative prerequisites by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), cross-filed with the Illinois Department of Human Rights ("IDHR"), and providing the EEOC an opportunity to investigate the matter, which it did.

7.    At the conclusion of its investigation, the EEOC issued a Determination that there was reasonable cause to believe that the City had discriminated against Doe based on her gender and had retaliated against her for engaging in protected activity. [*See* Exhibit A – Determination] Both the EEOC and IDHR subsequently issued to Doe a Notice of Right to Sue.

## PARTIES

8.    Plaintiff, Jane Doe, is a female citizen of the State of Illinois who is employed by Defendant City of Chicago as a police detective.

9.    Defendant City of Chicago is an Illinois municipal corporation located in Cook County, Illinois. Defendant City of Chicago is an employer and principal of the individual defendant actors.

10.    Defendant Larry Snelling is the Superintendent of the Chicago Police Department and was at all times relevant acting under color of law. Superintendent Snelling is sued in his individual capacity.

11.    Defendant Yolanda Talley was formerly the Chicago Police Department's Chief of the Bureau of Internal Affairs and was later promoted to First Deputy Superintendent of the Chicago Police Department and served in that role until recently. At all times relevant, Defendant Talley was acting under color of law. Defendant Talley is sued in her individual capacity.

12.    Defendant Angel Novalez is the Chief of Constitutional Policing and Reform of the Chicago Police Department and was at all times relevant acting under color of law. Chief Novalez is sued in his individual capacity.

13.    Defendant Antoinette Ursitti is the Chief of Detectives of the Chicago Police Department and was at all times relevant acting under color of law. Chief Ursitti is sued in her individual capacity.

4

14.     Defendant Arleseuia Watson was formerly a Sergeant in the Chicago Police Department's Area One, then promoted to a Lieutenant in the Confidential Section of BIA before being promoted again to her current role as Commander of Area One. She was at all times relevant acting under color of law. Commander Watson is sued in her individual capacity.

## FACTS

15.     Jane Doe has been a member of the Chicago Police Department for over a decade.

16.     After working as a police officer for several years, Doe was promoted to Detective.

17.     Detective Doe has performed her job with the CPD in an exceptional manner and has received numerous awards, including two Life Saving Awards.

18.     As a detective, she achieved high clearance and solve rates, and as a result, she was offered a coveted position on the Homicide Team in her assigned Area.

19.     In early 2020, Detective Doe and Defendant Marco Torres began working together on the same Homicide Team and watch, *i.e.*, shift.

20.     Torres engaged in a pattern of grooming behavior to manipulate Doe into what would become an abusive relationship.

21.     In or around April 2022, Doe began a relationship with Torres that soon took a violent and abusive turn.

22.     Over several months, Torres physically and psychologically abused Doe.

23.     He was so brazen about his abuse that, at times, he engaged in this abuse publicly and in their workplace.

24.     Torres repeatedly hit Doe, stalked her, forced her under threat of harm to turn on her phone's location so he could track her movements, and continually threatened her with additional violence.

5

25.     Torres required Doe to communicate with him via Snapchat, a phone application that allows users to send each other messages that auto-delete seconds after receipt.

26.     Torres routinely sent Doe violent and controlling messages via Snapchat, intending for them to disappear after Doe read them.

27.     Through Snapchat, Torres tracked Doe's movements and threatened her on a regular basis.

28.     When Doe protested being hit, Torres responded by telling her to "Take it and shut up," and "Right now u deserve everything u get," and "u deserve it."

29.     Torres threatened to kill Doe if she ever left him, and, on at least one occasion, explained to her how he planned to kill her, which included shooting her with her own gun in order to make her murder look like a suicide.

30.     Torres additionally threatened to release private photographs of Doe if she ended their relationship.

31.     Torres also warned her not to report his actions, explaining that he was involved in another sexual relationship with an officer in CPD's Bureau of Internal Affairs who would lie for him and who could get Doe fired.

32.     Torres also repeatedly threatened to kill himself if Doe ended their relationship.

33.     On one such occasion, in November 2022, Torres e-mailed Doe from his CPD e-mail address and threatened to kill himself if she did not go see him:



> **From:** Torres, Marco < ███████ @chicagopolice.org>
> **Sent:** Tuesday, November 1, 2022 6:02 PM
> **To:** ████████████████████
> **Subject:** Re:
>
> I dont want to die but ill do it tonighg if i dont see u for 5 minutes
>
> Sent from my Verizon, Samsung Galaxy smartphone

34.     In an effort to keep Torres from harming himself, Doe went to see Torres that night.

35.     After she arrived, Doe noticed Torres had pointedly placed his gun on the ground in plain view. He then sexually assaulted her while his gun lay only a few feet away.

**Doe's Initial Report of Torres's Abuse and Criminal Conduct – November 2022**

36.     Within days of this incident, Doe decided to formally report Torres's criminal conduct and abuse to BIA.

37.     A CPD evidence technician took photographs of the bruising to her body that resulted from Torres's attack.

38.     Doe subsequently sat for an hours-long interview with BIA personnel and members of the Civilian Office of Police Accountability ("COPA") in November 2022.

39.     Doe also provided extensive materials to the Department showing the severity of Torres's threats and criminal conduct.

40.     Doe provided the City with the names and contact information of witnesses.

41.     Doe additionally asked her employer, the CPD, to seek the contents of Torres's Snapchat account, as many of Torres's repeated threats of violence, including fatal violence, were contained in Snapchat messages to which Doe no longer had access.

42.     Unlike most employers, Doe's employer, as a police department, is uniquely situated to obtain the records she requested be obtained; seeking and retrieving social media messages are common investigative practices used by law enforcement agencies, including the CPD.

**The City Refuses to Investigate, Chooses to Punish Doe and Protect Torres**

43.     As part of Defendants' systemic gender bias, retaliation against whistleblowers, and conspiracy to deprive Doe of her Constitutional rights, Defendants refused to investigate Doe's

complaints of Torres's criminal conduct and violations of workplace rules; instead, Defendants chose to punish Doe and protect Torres.

44.     The City, including supervisors, detectives, and BIA personnel, refused to seek the evidence from Torres's phone or Snapchat account.

45.     Doe even offered voluntary consent to allow CPD to search her own Snapchat account, but the City refused even that.

46.     The City, including supervisors, detectives, and BIA personnel, refused to interview a single witness.

47.     The City, including supervisors, detectives, and BIA personnel, refused to order Torres to appear for an interview with BIA or even with a CPD supervisor.

48.     The City, including supervisors, detectives, and BIA personnel, did not even bother to informally ask Torres about Doe's complaints of his extensive gender-based violence against her or about the many messages she provided revealing his violent and stalking behavior.

49.     Instead, the City chose to improperly limit the scope of Doe's complaints against Torres, opening a police report under only one instance of criminal sexual assault.

50.     The City then refused to conduct an investigation and summarily closed the matter in or around December 2022 with no finding against Torres.

51.     After Doe reported Torres's unlawful conduct and gender violence, the City immediately retaliated against her by involuntarily removing, *i.e.,* "dumping", her from her prestigious assignment with the Homicide Team.

52.     Homicide is a very coveted assignment amongst detectives and provides benefits, perks, and career and compensation opportunities not available to other detectives.

8

53.     For example, detectives assigned to Homicide Teams routinely receive significantly more overtime opportunities and compensation than detectives not assigned to Homicide.

54.     The Homicide Team Doe was assigned to prior to reporting Torres is currently on a 10-hour day schedule that allows for more full days off, as well as more desirable days off, such as weekend days.

55.     Homicide detectives are also provided use of department vehicles while off duty, with gasoline paid for by the City, for certain periods of time each month.

56.     Homicide assignments are also beneficial to a detective's career for many reasons, including, *inter alia*, the opportunity to achieve high profile solves and the opportunity to work with top leaders within the CPD.

57.     After dumping Doe from her Homicide Team, the City then required her to move to a less desirable unit and work location, instructing her to cite "personal reasons" rather than a hostile work environment, warning her that reporting a hostile work environment would upset the Department.

58.     The City also changed Doe's preferred day off group, again involuntarily, to a day off group not of her choosing, while allowing Torres to remain in his day off group.

59.     When Doe arrived at her new work location, she asked to be assigned to its Homicide Team, but her request was denied.

60.     After closing Doe's initial complaint to BIA, in or around December 2022, the City did not bring any criminal charges against Torres.

61.     After closing Doe's initial complaint to BIA, in or around December 2022, the City did not issue Torres, who remained an employee of the City, any discipline whatsoever.

**Doe Asks the City to Re-Open the Investigation and to Protect Her, but the City Ignores Her**

62.     When Doe learned that the City was not seeking any disciplinary or criminal charges against Torres, and that it had neither sought the available evidence against him nor pursued any investigation into the full scope of his criminal conduct, Doe asked COPA to investigate and provided names and telephone numbers of certain witnesses.

63.     After COPA chose not to call any witnesses and took no action, Doe sought legal counsel to protect herself.

64.     At the time of Doe's initial report of Torres's unlawful conduct in November 2022, Torres was on a medical leave of absence from which he was due to return in February 2023.

65.     On or about February 14, 2023, Doe's counsel sent correspondence to the then-Chief of the Bureau of Internal Affairs, Defendant Yolanda Talley, advising Talley of the physical, psychological, and sexual abuse that Doe had endured at the hands of Torres, and of the grave threat of danger that Torres posed to Doe if he were permitted to return to the workplace.

66.     This correspondence, detailing Torres's abuse, was also sent to Defendant Angel Novalez, Chief of Constitutional Policing and Reform.

67.     Through her counsel, Doe requested that CPD protect her by, *inter alia*, barring Torres's return to the workplace, reporting his threats of fatal violence to the Illinois State Police, and re-opening Doe's complaint to conduct a full and proper investigation into the entire scope of Torres's criminal conduct, including his physical, psychological, and sexual misconduct.

68.     Doe's counsel provided Defendant Talley and Defendant Novalez with copies of Torres's abusive and threatening messages to Doe, including his threat to kill her.

69.     Doe's counsel also provided Defendant Talley and Defendant Novalez with a copy of Torres's threat to kill himself, sent from his City issued work e-mail account.

70.     Notwithstanding the incredibly serious nature of the reported misconduct, and that Defendant Talley was provided with proof of Torres's misconduct, Talley took no actions to address the matter and, in fact, didn't even bother to respond.

71.     Defendant Novalez, likewise, didn't bother to respond.

72.     Neither Defendant Talley nor Defendant Novalez took any action to protect Doe.

73.     Instead, the City returned Torres to work and allowed him to retain his gun.

74.     The City did not require Torres to undergo a fitness for duty evaluation even though it was aware he had threatened to kill Doe and threatened to kill himself.

75.     Doe's counsel additionally notified the Deputy Corporation Counsel of the Employment Litigation Division for the City's Department of Law of Torres's serious misconduct and of the grave danger he posed to Doe.

76.     The Deputy Corporation Counsel was also provided with the e-mails and other messages containing Torres's threats.

77.     He responded with what amounted to a form letter suggesting Doe make a report to BIA, an action Doe had advised she had already taken and had already failed her.

78.     Doe, through her counsel, sent two additional requests to the Deputy Corporation Counsel seeking a conversation on how to protect Doe and remedy the unlawful workplace.

79.     He chose not to respond to either request, even for a simple conversation on how to keep a female Chicago police officer safe from the male coworker who had threatened her life.

**After CPD Leaders and the City's Lawyer Refuse to Act, Doe Submits an**
**Amended Complaint to BIA, but the City Again Ignores Her — March 2023**

80.     After the City, Defendant Talley, Defendant Novalez, and the Deputy Corporation Counsel ignored her pleas for help, Doe sent an amended BIA complaint to Defendant Talley via e-mail in March 2023.

81.     Doe's amended BIA complaint formally requested that the investigation into her November 2022 complaint be re-opened, that a real investigation be conducted, and that it cover the full scope of Torres's conduct.

82.     Defendant Talley did not re-open the investigation and did not even respond to Doe's e-mail.

83.     Doe then sent a second e-mail to Defendant Talley asking her to confirm receipt of the amended complaint and to confirm that she would re-open the investigation.

84.     Defendant Talley responded with one word: "Received."

85.     At no time did Defendant Talley express any concern that a male CPD officer and employee had committed acts of violence against a female officer and that he had threatened to kill her and himself.

86.     Defendant Talley did not honor Doe's request to re-open the investigation, and BIA did nothing to investigate Torres's conduct after receiving Doe's March 2023 request.

87.     Rather, as part of their conspiracy against Doe, the City, Defendant Talley, Defendant Novalez, and others refused to investigate Torres or to take any remedial measures to hold Torres accountable for his conduct or to prevent further harm to Doe.

88.     The CPD is empowered to issue discipline against its employees that can be as minimal as a Summary Punishment Action Request ("SPAR"), which is intended for less serious transgressions, or as significant as termination from employment.

89.     The City and Defendants Talley and Novalez, having been presented with Torres's written threats and additional written evidence of his violent acts against Doe, did not even issue a SPAR to Torres.

12

90.    After receiving Doe's amended BIA complaint, CPD also did not seek any criminal charges against Torres nor take any further investigative actions in relation to Torres during the spring and summer months of 2023.

91.    During this time, at least two other CPD officers submitted written reports to the CPD about Torres, one of which described how Torres had engaged in gender violence and stalking behaviors against another female CPD officer years earlier.

92.    This report of Torres's past gender violence was sent directly to Defendant Talley.

93.    Defendant Talley still took no action to investigate.

94.    She did not contact the officer who submitted the report, nor did she have anyone else reach out to that officer to gather details or request an interview.

95.    Under Defendant Talley's leadership, BIA still did not even call Torres in for an interview to explain these now multiple reports of his gender violence.

96.    During this timeframe of March 2023 (when Doe submitted her amended complaint) through late summer 2023 (when faced with multiple alarming reports of Torres's gender violence), the City and CPD took no action to further investigate Torres, to hold him accountable, to arrest him, to issue him discipline, or to protect Doe from further harm.

**Having Faced No Accountability, Torres Continues to Harm and Pose a Threat to Doe**

97.    In the spring and summer of 2023, Torres continued to harass and pose a threat to Doe by, *inter alia*, locating her at a Starbucks and standing near her car waiting for her to exit, going to her former apartment building in search of her and asking the doorman if she still lived there, and attempting to obtain her work schedule.

98.    Torres's repeated attempts to locate Doe caused her significant fear and emotional distress.

99. Because the City had at all times refused to act to protect her safety, choosing instead to protect her harasser, Doe filed a Charge of Discrimination with the EEOC in or around April 2023, reporting the gender discrimination, harassment, and retaliation she had suffered and was continuing to suffer.

100. The City still took no investigative actions or remedial measures.

101. In and around August 2023, Doe then filed more than a dozen separate police reports, complaining of certain of Torres's unlawful actions as separate incidents, hoping her complaints would ensure that his actions toward her would be more fully investigated on an incident-by-incident basis.

102. Because Doe remained fearful of Torres, including how he would react to her recently filed police reports, and because the CPD had never taken a single remedial action to ensure her safety or prevent Torres from further harming her, Doe sought and obtained a civil Order of Protection against Torres in September 2023.

103. In granting Doe's petition for the Emergency Order of Protection, the court found that Torres "represents a credible threat to the physical safety" of Doe.

104. The court further ordered Torres to surrender his firearm and FOID card and ordered that his conceal and carry license be suspended for the duration of the Order of Protection.

105. While Torres was ultimately stripped of his police powers, his stripping was not a result of the City attempting to hold him accountable. Rather, by operation of Illinois law, he was prohibited from possessing a gun after having an Order of Protection entered against him.

106. The City did not terminate Torres's employment or seek any discipline on account of the Order of Protection being entered against him or on account of his violent and threatening conduct that justified the Order.

14

107.    The City allowed Torres to remain employed and permitted him to take a leave of absence.

108.    The Order of Protection required Torres to stay away from Doe, her workplace, and her residence at all times.

109.    Additionally, Torres was ordered not to have contact with Doe, directly or indirectly.

110.    Undeterred, Torres began reaching out to mutual CPD colleagues about Doe and directly asked at least one for Doe's home address in or around October 2023.

111.    Doe reported Torres's violation of the Order of Protection to her employer, the CPD, and she filed a police report regarding Torres improperly making contact indirectly and attempting to obtain her home address.

112.    The CPD still did not ask Torres for an interview to account for his actions but instead asked Doe to give another interview.

113.    Given the City's past mistreatment of Doe, Doe's counsel requested that the Cook County State's Attorney's Office be involved in any further interviews.

114.    The Cook County State's Attorney's Office then participated in interviews of two CPD detectives Torres had contacted, including the one from whom he asked for Doe's address.

115.    In November 2023, before those interviews could take place, Torres showed up at Doe's workplace at 1:00 a.m., when her shift ended, in violation of the Order of Protection.

116.    Another CPD detective observed him and reported the incident to BIA.

117.    No one from BIA contacted this detective, and no one from the CPD or the City contacted Torres, who remained an employee of the CPD and who could have been ordered to provide a statement at any time.

118.    It was only after Doe's counsel pressed BIA, in the presence of Cook County State's Attorney personnel, regarding why the detective who observed Torres at Doe's workplace was never contacted for an interview, that this detective was finally contacted.

119.    This detective then confirmed to BIA that she had observed Torres at Doe's workplace.

120.    As such, at this point in time, three CPD detectives confirmed in formal interviews that Torres had: made indirect contact with Doe, come to her workplace, and sought her home address.

121.    The CPD did not seek any criminal charges for these multiple violations of the Order of Protection and did not even discipline Torres for his continued conduct, as reported by these other detectives.

**After the State's Attorney's Office Becomes Involved, Torres Is Arrested – March 2024**

122.    After participating in the CPD detective interviews in or around December 2023, an Assistant State's Attorney ("ASA") requested transcripts of witness statements that had been given in the civil Order of Protection proceeding. In reviewing those transcripts, the ASA learned of a third-party witness, Torres's neighbor, who had personally observed Torres slap Doe, grab her violently, and yell "I'll kill you, I'll do it" on a public sidewalk on or about September 17, 2022.

123.    This witness, who the CPD refused to interview when Doe first provided her name and contact information in 2022, was then called in for a formal interview in March 2024 in which the Cook County State's Attorney's Office participated.

124.    The witness confirmed she observed Torres grab, slap, and threaten to kill Doe.

125.    Only then was Torres finally arrested, in March 2024, and charged with Assault-Simple and Domestic Battery.

126.    In continuing to protect Torres, the City still took absolutely no disciplinary action against him in the aftermath of his arrest.

127.    Torres remained an employee of the City, on a leave of absence, but still assigned as a detective with the CPD.

128.    The City also took no action whatsoever to protect Doe after Torres's arrest.

**After Torres's Arrest, the City Retaliates Against Doe by**
**Knowingly, Intentionally, and Willfully Placing Her in Danger of Being Killed**

129.    After his arrest, and as a result of the City condoning, authorizing, and encouraging his actions by seeking no discipline whatsoever against him, Torres continued to harass and threaten Doe as well as other individuals who were potential witnesses in the upcoming criminal trial against him.

130.    Just days after Torres was arrested, on or about March 25, 2024, Cook County Sheriff Deputy officers were dispatched to Torres's residence to provide him with a new court-issued electronic ankle monitor.

131.    The purpose of the ankle monitor, which was attached to a GPS tether, was to ensure that Torres kept his distance from Doe, pursuant to her Order of Protection, and to ensure that Doe would be alerted if he was in her vicinity.

132.    When the Cook County Sheriff Deputy officers arrived at his home, Torres repeatedly urged them to tell him Doe's home address.

133.    He asked for her address repeatedly and aggressively, calling Doe a "bitch."

134.    Concerned for Doe's safety, the officers refused to provide the address and reported Torres's unlawful attempts to gain Doe's address to their supervisor.

135.    The Cook County supervisor then contacted Doe to warn her of the threat to her safety.

136.    Doe then filed a police report concerning Torres's most recent violation of the Order of Protection.

137.    As part of their continued conspiracy to deprive Doe of her rights, Defendants again took no action against Torres for this violation of the Order of Protection.

138.    The City did not arrest Torres on account of this incident.

139.    The City did not discipline Torres on account of this incident.

140.    Over the next several months, Torres repeatedly called and/or texted other CPD officers who were potential witnesses in his upcoming criminal trial.

141.    Torres threatened witnesses not to testify against him and continued to seek Doe's home address.

142.    On May 20, 2024, just weeks after urging Cook County officers to give him Doe's address, Torres called and texted a CPD officer asking for Doe's address, explaining, "I need her address so this guy from gangs can get rid of her he wants a grand."



143.     The recipient of this text immediately reported the threat to BIA and provided BIA with a copy of the text.

144.      Out of concern for her safety, the recipient made Doe generally aware that Torres had made a serious threat about wanting to get rid of her, but he did not provide Doe with a copy of the text at that time.

145.     Doe and her counsel then expressly and repeatedly requested that the City, and specifically the CPD, provide Doe with a copy of the text in order to assess its severity and protect Doe's safety.

146.     The City ignored these requests altogether and refused to notify Doe that Torres had talked to a gang member about killing her, placing a specific price on her life.

147.     The City also took no action against Torres for this harrowing threat to have Doe killed.

148.     At the time this text was sent, the City employed both Doe and Torres.

149.     At the time this text was sent, Torres had been arrested for having threatened to kill Doe.

150.     At the time this text was sent, Torres had, approximately eight weeks earlier, repeatedly asked Cook County Sheriff Deputy officers for Doe's home address.

151.     At the time this text was sent, Torres had asked other CPD detectives for Doe's home address, as was reported to the City by those officers.

152.     But when the City became aware of the text message seeking Doe's address for the purpose of having her killed, it did nothing – not one thing – to alert her to this grave threat.

153.     By choosing not to inform Doe that a hit man may have been hired to kill her, the City made a deliberate choice to intentionally place Doe in harm's way.

19

154.    During this time, Doe was continuing to engage in protected activity, including in relation to her EEOC Charge of Discrimination, in litigation filed in the Circuit Court of Cook County, and by continuing to disclose Torres's persistent unlawful conduct to the CPD and to the Cook County State's Attorney's Office.

155.    For several months, the City refused to gather critical evidence to corroborate that Torres had placed the calls and sent the texts in May 2024 threatening witnesses and seeking Doe's address. It chose to feign ignorance instead of crediting the statements of multiple CPD detectives who stated that they recognized Torres's voice and that he identified himself.

156.    Doe and her counsel pleaded with the City, including in messages to BIA and Defendant Ursitti, to gather this critical evidence, but the City and its personnel refused.

157.    It was only several months later, in connection with felony charges being pursued by the Cook County State's Attorney's Office, that definitive records were finally obtained revealing that the cell tower pings from the phone used to make the calls and send the messages matched Torres's location, as identified by a GPS tether attached to his electronic monitor.

158.    Because the CPD intentionally refused to credit the statements of the witnesses, and refused to obtain the phone records, the City was able to shield Torres from being charged with additional violations of the Order or Protection or other criminal charges, which would have been a violation of his bond.

159.    In or around July 2024, while Torres was still facing criminal trial, and just weeks after he sent the text seeking Doe's address to have her killed, an unknown man appeared at an apartment building where Doe previously resided and asked the doorman if Doe still lived there.

160.    The doorman alerted Doe, and she made a police report.

161.    The apartment building confirmed to Doe that it had very clear video footage of this incident from which the man's identity could be determined.

162.    Upon information and belief, the building's management told BIA that it would provide a copy of the video upon receipt of a formal request such as a subpoena.

163.    CPD officers regularly serve subpoenas and search warrants as part of their investigations.

164.    Yet, BIA refused to request a copy of the video, despite multiple requests from Doe, including requests made to BIA and Defendant Ursitti.

165.    The City again chose not to take any action against Torres, still allowing him to remain a member of the police department without even so much as a disciplinary warning for repeatedly threatening Doe's life or for any of his multiple violations of the Order of Protection.

166.    After no action was taken, Doe again reached out to Defendant Ursitti, in or around September 2024, detailing the City's profound lack of action to protect her or to hold Torres accountable. Doe sought Defendant Ursitti's assistance with ensuring that CPD detectives pursued the appropriate investigative actions in a timely manner in order to protect her safety.

167.    Defendant Ursitti did not respond to Doe's request.

**Torres Is Convicted of Threatening to Kill Doe – October 2024**

168.    Despite the City's consistent and intentional inaction, due to the efforts of the Cook County State's Attorney's Office, Torres was convicted in October 2024 of having threatened to kill Doe on September 17, 2022.

169.    Doe's civil Order of Protection then became a criminal Order of Protection.

170.     Even during the trial, knowing his employer, the City, had never taken any action to hold him accountable for any of his past threats and unlawful conduct toward Doe, Torres continued to brazenly stalk Doe by following her vehicle after the first day of trial.

171.     Doe had strategically waited to leave the criminal courthouse until well after she knew Torres had left the building for fear of being followed by him.

172.     However, soon after Doe left the building, she received an alert on her electronic signaling device that Torres was close to her location.

173.     These alerts continued, and dispatch notified Doe that Torres was following behind her vehicle.

174.     When officers intercepted Torres shortly thereafter, they confirmed he was in Doe's proximity and told him to leave the area.

175.     Even Torres's continued stalking – during his criminal trial –  did not lead the City to take any action to protect Doe or to discipline Torres.

176.     Torres continued to harass and threaten Doe thereafter, including by entering into her proximity zone with regularity.

**Torres's Felony Arrest for Witness Harassment – March 2025**

177.     On or about March 18, 2025, Torres was arrested and indicted by a grand jury on the felony charge of Harassment of a Witness under 720 ILCS 5/32-4a, after the State's Attorney's Office confirmed that the threatening text messages sent to witnesses in May 2024 came from Torres.

178.     Specifically, Torres was charged and indicted for threatening a witness in the criminal case not to testify against him, warning that his commander, Arleseuia Watson, could get the witness fired.

179.    This text also threatened that Commander Watson could have Doe fired as well.

180.    At the time of Doe's initial complaint against Torres in November 2022, Commander Watson was a Lieutenant in the Confidential Section of BIA; she improperly chose not to recuse herself from the investigation of Doe's complaint against Torres despite having worked with both Doe and Torres when she was a Sergeant in Area One. While in BIA, Defendant Watson was complicit in the conspiracy to shield Torres from accountability, and she was complicit in summarily closing Doe's complaint against him. Soon thereafter, CPD promoted her to Commander of Area One, and she resumed working directly with Torres again.

181.    The text that led to Torres's indictment for felony witness harassment also threatened to find Doe, stating "You can tell her ill know her address im a detective i can figure that out." (sic).

182.    Torres was not charged for this third-party/indirect contact with Doe despite it constituting a violation of the Order of Protection.

183.    On the same day this text was sent, Torres had called and sent texts to several other CPD members, including the text wherein he concedes he talked with a "guy from gangs" about "get[ting] rid" of Doe. In the State's Proffer in the felony witness harassment case against Torres, the State expressly referenced this text and described how the text messages were sent from a burner phone that law enforcement was able to tie to Torres via his location.

184.    At the time of his felony arrest in March 2025, Torres remained an employee of the CPD, but the City still chose not to take any disciplinary action against him whatsoever.

185.    It was in connection with the felony arrest that Doe finally learned the exact contents of the text threatening to have her killed for $1,000.

186.    Doe's counsel sent an e-mail to the City's attorneys alerting them to the grave nature of this threat and detailing how no one from the City ever once alerted Doe to the specifics of the threat or warned her that someone may be trying to kill her.

187.    Doe's counsel expressly asked the City's lawyers to share the e-mail and text with Chicago Mayor Brandon Johnson and Superintendent Snelling to ensure their awareness.

188.    Mayor Johnson and Superintendent Snelling knew or should have already known that a current Chicago police officer had been convicted of threatening to kill another Chicago police officer and arrested for felony witness harassment of yet another Chicago police officer.

189.    Upon information and belief, Superintendent Snelling participates in weekly meetings with police Chiefs and Commanders, including the individual Defendants, to discuss significant issues within the Chicago Police Department, including news media articles involving the CPD, which would have included news media articles about Torres's unlawful conduct, his arrests, and his conviction, as well as news media articles about Doe's complaints against the City and Torres.

190.    Upon information and belief, Mayor Johnson is also provided a daily update of news media articles involving the CPD which would have included those same news media articles.

191.    Superintendent Snelling has the authority to suspend a CPD officer's employment or to file charges against an officer with the Police Board; he could have taken action against Torres at any time during Torres's course of criminal, harassing, and stalking conduct directed at Doe.

192.    Superintendent Snelling did not suspend Torres's employment or file charges with the Police Board against Torres.

24

193.     Superintendent Snelling chose to retain Torres as an employee and to leave Doe under threat of harm.

194.     By continually choosing to protect Torres rather than disciplining him for his repeated unlawful conduct and egregious harassment of Doe, the City and its policymakers have condoned, authorized, encouraged, and emboldened Torres's behavior.

**Torres Continues to Harass Doe and Remains a Threat to Doe To Date**

195.     Even since his conviction and felony arrest, Torres has continued to harass Doe, including by regularly entering her proximity zone, in direct violation of a court order, in order to track her location.

196.     Doe carries with her a court-issued device that alerts her when Torres enters her vicinity based on the GPS location of his electronic monitoring device. She has received numerous alerts that Torres is in her proximity zone.

197.     Torres has repeatedly entered areas near Doe's workplace and other locations she is known to frequent.

198.     In November 2025, after driving on the expressway toward the suburbs, Doe received numerous alerts just as she exited the expressway, that Torres had entered her proximity zone.

199.     This was very alarming to Doe because she was unsure how Torres, who lives nowhere near that particular suburb, was able to find her traveling far outside of the city center.

200.     Alarmed by these alerts, after Torres finally left her proximity, Doe had her vehicle inspected and found a tracking device that had been placed behind the wheel well of her car.

201.     At the time of this incident, Doe's criminal Order of Protection against Torres was only days away from potentially expiring.

202.    Torres's actions made it clear to Doe that he knew where she was and that he could get to her if he wanted to.

**The City Knew or Should Have Known of**
**Torres's Propensity for Violence and Sexual Misconduct**

203.    The City knew, or should have known, of Torres's propensity for violence and misconduct, including sexual misconduct, long before Torres even met Doe.

204.    Torres has a history of violence known to the City and has been named in multiple excessive force complaints, including complaints involving unjustified shootings.

205.    Torres committed prior acts of sexual harassment, stalking, and gender violence toward other women, including at least one other female CPD officer years before he directed his abuse toward Doe.

206.    Torres has admitted in sworn testimony to also having been in a sexual relationship with a female member of the CPD's Bureau of Internal Affairs.

207.    Torres used his relationship with this female (now former) BIA officer to threaten Doe if she ever reported him.

208.    Even after the City was made expressly aware of Torres's conduct against Doe, the City consistently condoned and encouraged his actions by refusing to hold him accountable.

**As Doe Continues to Report Torres's Misconduct and Assert Her Rights**
**Under Federal and State Law, the City Continues to Retaliate Against Her**

209.    Since 2022, Doe has continuously engaged in whistleblowing and other protected activity by, *inter alia*, reporting and disclosing further criminal conduct committed by Marco Torres to the City and Cook County State's Attorney's Office; filing and pursuing a Charge of Discrimination with the EEOC and continuing to protest gender discrimination, harassment, and

retaliation under federal and state laws; and filing and pursuing a state court action in the Circuit Court of Cook County against the City for violations of state law.

210.    As Doe has continued to engage in protected activity, the City has continued to retaliate against her as described above and by additionally, *inter alia*, denying her career opportunities, continuing to treat her with hostility and disparately to how it has treated Marco Torres, issuing a notice of allegations of workplace violations against her, and effectively barring her from any further career advancement within the CPD.

211.    The City has repeatedly rejected her applications for assignment to vacant positions on Homicide Teams despite her clear qualifications, having previously served and performed excellently on a Homicide Team.

212.    In or around February 2025, Doe applied for an open position on the Homicide Team in Area One, where she previously worked with distinction and where Defendant Watson remains the Commander.

213.    Defendant Watson rejected her application without explanation or even formal notice to Doe.

214.    In CPD parlance, Detective Doe has been "bricked," meaning she is effectively barred from further career advancement within the CPD, as a punishment in retaliation for her whistleblowing and protected activity.

215.    Additionally, within weeks of the EEOC issuing its finding that the City had discriminated and retaliated against Doe, the City threatened to discipline Doe, including for using her City email account to communicate personally with Marco Torres.

216. The City retaliated against Doe by weaponizing statements and evidence she provided to the City when she first went to BIA as a victim to report Torres's abuse and unlawful conduct.

217. The City had been aware of her communications for three years but chose to seek discipline only after Doe continued to engage in protected activity.

218. Defendants' consistent retaliation against Doe is designed to send a message to, and dissuade others from, reporting misconduct within CPD and from asserting their own rights under federal and state law.

**The City's Unlawful Treatment of Doe is Consistent with**
**Several of the City's Customs, Practices, and Policies**

219. At all times relevant hereto, the City acted pursuant to its well-established customs, practices, and policies that harm women and whistleblowers alike.

220. Specifically, the City, and in particular the CPD, maintains a custom, practice, and policy of condoning gender violence, including sexual misconduct and domestic abuse committed by male CPD officers against female CPD officers, by failing to investigate, hold criminally accountable, or discipline accused male officers.

221. The CPD's tolerance of violent misogyny within its ranks has enabled an additional custom, practice, and policy of treating female victims of domestic and gender violence disparately, routinely discrediting them, and failing to protect them from further harm, whether the men committing the harm are CPD officers or not.

222. The City, and in particular the CPD, also maintains a custom, practice, and policy of shielding officers who commit misconduct from accountability and retaliating against whistleblowers who report them, commonly known as the Code of Silence.

*Condoning Gender Violence Among Male Officers*

223.     The CPD has a systemic problem with violent misogyny, and numerous officers have been accused of, and/or adjudicated of having engaged in, sexual harassment, sexual assault, and domestic or other gender-related violence.

224.     In 2017, the United States Department of Justice found that in sexual assault and domestic violence cases, Chicago police investigators were quick to credit the male offending officers' accounts over their female victims' accounts, despite the availability or potential availability of additional evidence in support of the female victims.

225.     The Consent Decree entered into between the City and the State of Illinois in 2019 expressly addressed this problem and required that: "Within 180 days of the Effective Date, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature."

226.     Nearly seven years later, the CPD still has not fully complied with this requirement.

227.     In May 2025, the news media organization Pro Publica published its findings of an extensive review of hundreds of allegations of sexual misconduct made against CPD officers. The findings discuss how the CPD failed to stop repeat offenders, with numerous officers facing multiple sexual assault allegations, and how the CPD maintained a pattern of "failing to vigorously investigate accusations of sexual assault by officers, whether those complaints were lodged by fellow cops or members of the public."

228.     Among other matters, the findings of the Pro Publica investigation discuss how the CPD fired a female police academy recruit who reported a fellow recruit, Eric Tabb, for sexually harassing and assaulting her in 2023 while they were both in the academy. Tabb denied the

allegations, and the CPD chose to credit his denial and fired the female whistleblower. After Tabb remained employed and was permitted to become a full member of the CPD, he soon faced multiple additional allegations of sexual harassment and assault by several other female CPD officers. Tabb later pleaded guilty to two counts of aggravated battery in a public place in exchange for prosecutors dropping eight counts of criminal sexual abuse. In his defense, Tabb's criminal defense attorney pointed to the CPD's failure to make adverse disciplinary findings against him and to the CPD's decision not to pursue criminal charges as proof of innocence.

229.    There are numerous other instances of male CPD officers being accused of sexual misconduct with little, no, or significantly delayed accountability or investigation.

230.    In several instances, the CPD will reject a recommendation by COPA for significant discipline or termination from employment, choosing instead to retain male officers accused of sexual misconduct, even where the men have been accused by multiple women and/or where findings have been made against the men.

231.    Quite incredibly, Detective Doe is not even the only female CPD officer who has been threatened with murder by a male CPD officer who was her former romantic partner.

232.    In 2023, the Office of Inspector General recommended firing a male Chicago police detective who, like Torres, threatened to kill his former romantic partner, a female CPD officer, after she ended the relationship. The City refused to fire the man and allowed him to keep his job.

### *Discrediting and Refusing to Protect Female Victims of Gender Violence*

233.    The City's systemic view that women are not to be believed enables a custom, practice, and policy of the City, and in particular the CPD, of refusing to protect female victims of gender violence and refusing to investigate or hold their abusers accountable criminally.

234. The Consent Decree between the City and the State of Illinois expressly addresses this problem and requires that: "CPD will require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. All officers will receive in-service training every three years to ensure CPD's response to allegations of gender-based violence, including dispatch response, initial officer response, and on-scene and follow-up investigation, is both effective and unbiased."

235. Nearly seven years later, the CPD still has not fully complied with this requirement.

236. The CPD routinely credits the denials of accused males and disregards the serious allegations made by women as "he-said/she-said" incidents, even when there is corroborating evidence.

237. In January 2024, COPA recommended that Chicago Police Sergeant, Christopher Lockhart, be fired following its investigation into allegations of Lockhart's acts of domestic violence, which included grabbing his then-girlfriend by the neck, slamming her to the floor, and sexual assault. Lockhart remains employed and eligible for promotion within the CPD.

238. The CPD's custom, practice, and policy of failing to investigate and hold criminally accountable men who commit gender violence goes back decades. In 1989, the Administrator of the Estate of Selena Johnson sued the City of Chicago after Ms. Johnson, who worked as a Chicago police officer, was murdered by her abusive husband, who was also a Chicago police officer. The lawsuit claimed that Ms. Johnson had repeatedly made the CPD aware of her husband's threats, violence, and violations of orders of protection she obtained against him. The lawsuit further claimed that when she reported his abuse to the CPD's (then existing) Office of Professional Standards, her complaint was "not sustained" and that her husband thereafter continued to abuse her. She continued to report him to the CPD, and the CPD continued to take no action and did not

arrest him after she pleaded for him to be held criminally accountable. The lawsuit additionally claimed that on account of the CPD's awareness and refusals to act, her husband then killed her. After the court denied the City's motion for summary judgment, recognizing that the City had a duty to act to protect Officer Johnson, the City resolved the matter.

239.    The City has, however, learned nothing from the sad story of Selena Johnson, as it continues to act with depraved indifference to Jane Doe's rights and physical safety. This indifference has included refusing to tell Doe that Torres discussed paying to have her killed, refusing to obtain video evidence of a man searching for Doe at her former residence, and refusing to investigate or hold Torres accountable – criminally or by means of workplace discipline – for the full scope of his unlawful conduct and workplace violations, including multiple violations of court orders entered to protect Doe.

### *Code of Silence*

240.    The City's inaction and desire to protect Torres, while punishing Doe, is consistent with its well-established custom, practice, and policy of maintaining a Code of Silence whereby the CPD shields officers who commit misconduct from accountability and retaliates against the whistleblowers who report them.

241.    The Code of Silence has been acknowledged by several Chicago mayors and in official reports, including from the Police Accountability Task Force and the United States Department of Justice.

242.    The systemic problems related to lack of accountability for Chicago police officers who engage in misconduct is a focus of the Consent Decree entered into between the City of Chicago and State of Illinois.

243.    In recent years, several Circuit Court of Cook County juries have found the City liable for retaliating against police officers who have disclosed unlawful conduct committed by other police officers.

244.    Notwithstanding the reports, the Consent Decree, and that juries continue to affirm the existence of the City's Code of Silence, the City has steadfastly refused to take a single meaningful measure to dismantle this destructive Code.

245.    Indeed, when faced with the opportunity to right wrongs early and publicly, the City chooses to stand by bad actors and pay outside attorneys to defend their actions at a heavy cost to taxpayers and to any chance at reform.

246.    Here, the City has had years to meaningfully investigate the full scope of Torres's repeated misconduct and to hold him accountable.

247.    By refusing to do so, the City is sending a message to other bad actors within CPD that they can engage in unlawful conduct, and the City will protect them and retaliate against anyone who dares disclose their misconduct.

248.    The Code of Silence harms the City, its citizens, and the thousands of police officers within CPD who perform their jobs valiantly and are committed to serving and protecting the citizens of Chicago. The vast majority of CPD officers who are committed to ethical policing are harmed reputationally and undoubtedly suffer a loss of morale on account of the City choosing to enable unlawful conduct by the few.

249.    Due to the City's customs, practices, and policies, Doe has suffered significant harms on account of Torres's continued threats, stalking, and harassment, and on account of the City's persistent discrimination and retaliation against her, which, in this case, extended far beyond affecting her employment opportunities – the City chose to put her life in danger.

**Doe Has Suffered Significant Harms as a Result of Defendants' Unlawful Treatment of Her**

250.     On account of Defendants' unlawful conduct, Doe has suffered significant damages, including a loss of employment opportunities, compensation, and other employment benefits.

251.     Doe has suffered additional financial losses as part of her efforts to protect her own safety, including incurring legal fees and court costs in connection with securing orders of protection against Torres after the City refused to take any action, and in connection with efforts to prevent Torres from tracking or finding her.

252.     Defendants' unlawful conduct was intended to cause Doe, and did cause Doe, to suffer severe emotional distress.

253.     Defendants knew, or should have known, of Doe's susceptibility to severe emotional distress not only because of the severe nature of Torres's abuse and threats to kill her, but also because Doe repeatedly expressed her fear and distress to her employer, the CPD, and made repeated pleas to the CPD to protect her safety. The individual Defendants were either recipients to, or otherwise made aware of, these repeated pleas.

254.     Due to Defendants' multiple violations of her rights, Doe has suffered severe emotional distress and mental anguish, humiliation, damage to her reputation, fear, anxiety, physical harm, and she has endured significant trauma, sleepless nights and significant disruption to her sleep patterns, weight gain and fluctuations, crying spells, and nightmares.

255.     Doe has additionally suffered extreme stress and loss of enjoyment of life, including on account of having to maintain hypervigilance to her safety, having to change her routines, and not having the desire or ability to enjoy activities previously enjoyed.

256. On account of the severe emotional distress she has suffered, Doe has been continuously in therapy for several years.

257. Plaintiff demands to exercise her right to a jury trial of this matter.

## COUNT I
### Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e, *et seq*.
### Sex Discrimination
### (Against the City of Chicago)

258. Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

259. Title VII as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.*, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

260. By its conduct as alleged herein, the City treated Plaintiff disparately on the basis of her sex, female, and subjected Plaintiff to sex discrimination in violation of Title VII.

261. The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

262. As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT II
### Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e, *et seq*.
### Sexual Harassment and Hostile Work Environment
### (Against the City of Chicago)

263. Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

35

264.    Title VII of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.*, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

265.    A hostile work environment based on sex, including physical or verbal unwelcome sexual conduct by an individual of a *quid pro quo* nature or that has the purpose or effect of creating an intimidating, hostile, or offensive work environment, is actionable under Title VII.

266.    The City failed to take proper preventative, corrective, or remedial action to protect Plaintiff from sexual harassment and a sex-based hostile work environment or to remedy the harassment and environment she suffered.

267.    The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

268.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT III
### Title VII of the Civil Rights Act of 1965, 42 U.S.C. §§ 2000e, *et seq.*
### Retaliation
### (Against the City of Chicago)

269.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

270.    Title VII of the Civil Rights Act, specifically 42 U.S.C. § 2000e-3, makes it unlawful for an employer to discriminate or retaliate against any employee because she has opposed any unlawful employment practice or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing pursuant to Title VII.

36

271.    By its conduct as set forth herein, the City retaliated against Plaintiff for her internal and external complaints of, and opposition to, sex discrimination and harassment.

272.    The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

273.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT IV
### 42 U.S.C. § 1983 (*Monell*)
### Equal Protection – Sex Discrimination
### (Against the City of Chicago)

274.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

275.    At all times relevant, the City of Chicago has acted under the color of law.

276.    The City's intentional sex discrimination against Plaintiff and other female employees was so widespread and well-settled as to constitute a custom, practice, and standard operating procedure of the City, the *de facto* equivalent of a formal policy of sex discrimination with the force of law.

277.    By its conduct as alleged herein, the City has deprived Plaintiff of the right to be free from sex discrimination.

278.    The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

279.    As a direct and proximate result of the City's policy of sex discrimination against Plaintiff, she has suffered injuries including but not limited to the loss of compensation,

employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

**COUNT V**
**42 U.S.C. § 1983 (*Monell*)**
**Equal Protection – Hostile Work Environment**
**(Against the City of Chicago)**

280.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

281.    At all times relevant, the City of Chicago has acted under the color of law.

282.    The City failed to take proper preventative, corrective, or remedial action to protect Plaintiff from sexual harassment and a sex-based hostile work environment or to remedy the harassment and environment she suffered.

283.    The City's intentional refusal to take proper preventative, corrective, or remedial action against employees who perpetrate a sex-based hostile work environment and/or sexual harassment or violence against female employees in the Chicago Police Department has been so widespread and well-settled as to constitute a custom, practice, and standard operating procedure of the City, the *de facto* equivalent of a formal policy of allowing and encouraging a sex-based hostile work environment and sexual harassment of women with the force of law.

284.    By its conduct as alleged herein, the City has deprived Plaintiff of the right to be free from a severe or pervasive sex-based hostile work environment and sexual harassment.

285.    The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

286.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits,

employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT VI
### 42 U.S.C. § 1983 (*Monell*)
### Equal Protection – Retaliation
### (Against the City of Chicago)

287.     Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

288.     At all times relevant, the City of Chicago has acted under the color of law.

289.     Through the actions described above, the City retaliated against Plaintiff on account of her sex and for her internal and external complaints of, and opposition to, sex discrimination and harassment.

290.     The City's intentional retaliation against Plaintiff and other female whistleblowers for complaining about the unlawful actions of other individuals employed in the Chicago Police Department has been so widespread and well-settled as to constitute a custom, practice, and standard operating procedure of the City, the *de facto* equivalent of a formal policy of retaliation with the force of law.

291.     By its conduct as alleged herein, the City has deprived Plaintiff of the right to be free from retaliation.

292.     The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

293.     As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress

## COUNT VII
### 42 U.S.C. § 1983 (*Monell*)
### Substantive Due Process
### (Against the City of Chicago)

294.     Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

295.     At all times relevant, the City of Chicago has acted under the color of law.

296.     Acting under the color of law and within the scope of his employment as a Chicago police officer, Marco Torres violated Plaintiff's substantive due process rights by unlawfully violating her bodily integrity and violating her right to be free from physical abuse and battery.

297.     The City's deliberate failure to investigate, discipline, or hold its officers accountable emboldened police officers to believe they were above the law and to act with impunity, without fear of repercussions, such as being investigated and disciplined, and was a driving force behind Torres's conduct toward Plaintiff, and affirmatively placed Doe in danger.

298.     The City's deliberate refusal to take proper preventative, corrective, or remedial action against male employees of the Chicago Police Department who perpetrate gender violence against females, including female employees, has been so widespread and well-settled as to constitute a custom, practice, and standard operating procedure of the City, the *de facto* equivalent of a formal policy of allowing and encouraging male employees to deprive women, including female employees, of their constitutional rights.

299.     By its conduct as alleged herein, the City has deprived Plaintiff of her right to due process, including her liberty interest in her bodily integrity and freedom of movement.

300.     The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

301.     As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT VIII
### 42 U.S.C. § 1983
### Equal Protection – Sex Discrimination
### (Against all Individual Defendants)

302.     Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

303.     At all times relevant, the individual Defendants have acted under the color of law.

304.     By their conduct as alleged herein, the individual Defendants treated Plaintiff disparately on the basis of her sex and subjected Plaintiff to sex discrimination in violation of her equal protection rights.

305.     The individual Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

306.     As a direct and proximate result of the individual Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT IX
### 42 U.S.C. § 1983
### Equal Protection – Hostile Work Environment
### (Against all Individual Defendants)

307.     Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

308.     At all times relevant, the individual Defendants have acted under the color of law.

309.     By its conduct as alleged herein, the individual Defendants failed to take proper preventative, corrective, or remedial action to protect Plaintiff from sexual harassment and a sex-based hostile work environment or to remedy the harassment and environment she suffered.

310.     The individual Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

311.     As a direct and proximate result of the individual Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

### COUNT X
**42 U.S.C. § 1983**
**Equal Protection - Retaliation**
**(Against all Individual Defendants)**

312.     Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

313.     At all times relevant, the individual Defendants have acted under the color of law.

314.     By its conduct as alleged herein, the individual Defendants retaliated against Plaintiff on account of her sex and for her internal and external complaints of, and opposition to, sex discrimination and harassment.

315.     The individual Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

316.     As a direct and proximate result of the individual Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment

benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

<u>COUNT XI</u>
**42 U.S.C. § 1983**
**Substantive Due Process**
**(Against all Individual Defendants)**

317.     Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

318.     At all times relevant, the individual Defendants have acted under the color of law.

319.     Acting under the color of law and within the scope of their employment by the City of Chicago, Defendants violated Plaintiff's substantive due process rights by acting to deprive Plaintiff of her substantive due process rights to her liberty interest in her bodily integrity and freedom of movement.

320.     The individual Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

321.     As a direct and proximate result of the individual Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

<u>COUNT XII</u>
**42 U.S.C. § 1983**
**Conspiracy**
**(Against all Individual Defendants)**

322.     Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

323.     At all times relevant, the individual Defendants have acted under the color of law.

43

324.     Beginning in or around November 2022, when Plaintiff first reported Torres's abuse and criminal conduct to BIA, and continuing through the present, the individual Defendants reached an express or implied agreement among themselves to deprive Plaintiff of her constitutional rights to equal protection and due process under the Fourteenth Amendment to the United States Constitution.

325.     The objective of the conspiracy was to act in conformity with the City's customs, practices, and policies as set forth herein, to shield Torres from accountability for his criminal conduct and workplace violations, to retaliate against Plaintiff for reporting Torres's misconduct and engaging in protected activity, and to deny Plaintiff the equal protection of the laws on account of her sex and to deny her substantive due process rights.

326.     The existence of the agreement among Defendants arises from, *inter alia*: the coordinated pattern of inaction across multiple CPD departments, including the consistent refusal to take any meaningful investigative steps despite the severity of the allegations; the coordinated decision to summarily close Plaintiff's November 2022 complaint without investigation; the uniform failure to respond to correspondence from Plaintiff or her counsel; the collective decision to withhold from Plaintiff the specific contents of Torres's May 2024 text message threatening to have her killed; the pattern of retaliatory actions against Plaintiff following her protected activity; and the consistent protection afforded to Torres.

327.     In furtherance of the conspiracy, each individual Defendant took specific overt acts, including, *inter alia*:

        a.    Defendant Snelling: as Superintendent of Police, permitted and oversaw the implementation of the City's customs, practices, and policies as set forth herein and specifically as relating to Plaintiff's complaints against Torres, harming Plaintiff while protecting Torres; at all times, refused to take any action against Torres notwithstanding his authority to do so and

despite Torres's arrest, conviction, and felony indictment, choosing instead to retain Torres as an employee of the CPD; refusal to take any action to ensure Plaintiff's safety or to remedy the hostile work environment she was subjected to, including refusal to take any action after being notified Torres had sent a text admitting to conspiring to have Plaintiff killed; and allowing the pattern of retaliation against Plaintiff to continue under his leadership;

b. <u>Defendant Talley</u>: refused to interview, or require the interview, of witnesses despite her authority to do so as Chief of BIA; refused to order Torres to provide a statement despite her authority to do so; refused to seek available evidence from Torres's phone or Snapchat account; refused to respond to correspondence or take remedial actions when alerted to Torres's abuse in February 2023; refused to re-open Plaintiff's complaint after receiving her amended complaint in March 2023; refused to take any action upon receiving a report describing Torres's prior gender violence against another female officer; refused to take any action to protect Plaintiff or hold Torres accountable after being informed of Torres's multiple violations of the Order of Protection; and refused to issue any discipline against Torres despite being provided with written documentation of his threats and violence against Doe;

c. <u>Defendant Novalez:</u> refused to respond to correspondence or take remedial actions when alerted to Torres's abuse in February 2023; refused to take any action within his authority as Chief of Constitutional Policing and Reform to address reported misconduct of a severe nature or to ensure Plaintiff's safety; refused to take any action as Chief of Constitutional Policing and Reform even after a CPD officer (Torres) was convicted of threatening to kill a woman (Doe); refused to ensure that the CPD was acting in conformity with the reform mandates for accountability as set forth in the Consent Decree entered into between the City and the State of Illinois; and refused to ensure that the CPD conducted a proper investigation into Plaintiff's complaints or took remedial measures to protect her from further harm;

d. <u>Defendant Ursitti</u>: refused to respond to Plaintiff's requests for assistance in ensuring CPD detectives pursued appropriate investigative actions, including obtaining phone records that would tie Torres to the threatening text messages; refused to ensure that BIA detectives obtained video footage from Plaintiff's former apartment building that would identify the man searching for her; refused to respond to Plaintiff's September 2024 correspondence

detailing the City's profound lack of action and again seeking her assistance in protecting Plaintiff's safety; and refusing to take any action within her authority as Chief of Detectives to protect Plaintiff's safety or hold Torres accountable;

e. <u>Defendant Watson</u>: improperly refused to recuse herself from Plaintiff's November 2022 complaint despite having worked directly with both Plaintiff and Torres in Area One; participated in summarily closing Plaintiff's November 2022 complaint without investigation; was identified by Torres as someone who could get both Plaintiff and another witnesses against him fired, suggesting a known relationship between Watson and Torres that facilitated the conspiracy; as Commander of Area One, retaliated against Plaintiff by rejecting her application for a vacancy on the Area One Homicide Team despite Plaintiff's qualifications and prior distinguished service on that team.

328.    As a direct and proximate result of the conspiracy among the individual Defendants, Plaintiff was actually deprived of her constitutional rights to equal protection and due process, including, without limitation: her right to be free from sex discrimination and a hostile work environment; her right to be free from retaliation for engaging in protected activity; her right to liberty interest in her bodily integrity and freedom of movement.

329.    The individual Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's constitutional rights.

330.    As a direct and proximate result of the individual Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XIII
### 42 U.S.C. § 1985
### Civil Conspiracy
### (Against all Individual Defendants)

331.　Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

332.　Section 1985(3) of Title 42 of the United States Code prohibits two or more persons from conspiring to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.

333.　At all times relevant, the individual Defendants acted under the color of law.

334.　Beginning in or around November 2022, when Plaintiff first reported Torres's abuse and criminal conduct to BIA, and continuing through the present, the individual Defendants reached an express or implied agreement among themselves to deprive Plaintiff of her constitutional right to equal protection under the Fourteenth Amendment to the United States Constitution.

335.　The objective of the conspiracy was to act in conformity with the City's customs, practices, and policies as set forth herein, and to shield Torres from accountability for his criminal conduct and workplace violations, to retaliate against Plaintiff for reporting Torres's misconduct and engaging in protected activity, and to deny Plaintiff the equal protection of the laws on account of her sex.

336.　The gender-based animus motivating the conspiracy includes, *inter alia*: the stark disparity in Defendants' treatment of the male abuser versus the female victim; the Defendants' calculated decision to conceal from Plaintiff that Torres had discussed paying a gang member to kill her, reflecting a devaluation of her life and safety because she is female; the Defendants' custom, practice, and policy of protecting male officers accused of gender-based violence while

discrediting and failing to protect female victims; and CPD's systemic failures regarding gender violence.

337. The existence of the agreement among Defendants is detailed in Paragraph 326 of Count XII, *supra*.

338. In furtherance of the conspiracy, the individual Defendants took specific overt acts as detailed in Paragraph 327 of Count XII, *supra*.

339. As a direct and proximate result of the conspiracy among the individual Defendants, Plaintiff was actually deprived of her constitutional rights to equal protection, including, without limitation: her right to be free from sex discrimination and a hostile work environment; and her right to be free from retaliation for opposing sex discrimination.

340. The individual Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's constitutional rights.

341. As a direct and proximate result of the individual Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

**COUNT XIV**
**Illinois Civil Conspiracy**
**(Against all Individual Defendants)**

342. Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

343. In the State of Illinois, a civil conspiracy consists of a combination of two or more persons agreeing to a common course of action to achieve either an unlawful purpose or a lawful purpose by unlawful means.

344.    The conspiracy engaged in by the individual Defendants facilitated, encouraged, and assisted the commission of the numerous tortious acts against Plaintiff, including: Intentional Infliction of Emotional Distress; Assault; Battery; Violation of the Illinois Gender Violence Act; Retaliation in violation of the Illinois Whistleblower Act; Sex Discrimination and Hostile Work Environment in violation of the Illinois Human Rights Act; and Violation of the Illinois Civil Rights Act.

345.    The existence of the agreement among Defendants is detailed in Paragraph 326 of Count XII, *supra*.

346.    In furtherance of the conspiracy, each individual Defendant took specific overt acts as detailed in Paragraph 327 of Count XII, *supra*.

347.    The individual Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's constitutional rights.

348.    As a direct and proximate result of the individual Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XV
### Illinois Human Rights Act, 775 ILCS 5/2-102
### Sex Discrimination
### (Against the City of Chicago)

349.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

350.    The Illinois Human Rights Act ("IHRA") makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

351.     By its conduct as alleged herein, the City treated Plaintiff disparately on the basis of her sex, female, and subjected Plaintiff to sex discrimination in violation of the IHRA.

352.     The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's constitutional rights.

353.     As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

**COUNT XVI**
**Illinois Human Rights Act, 775 ILCS 5/2-102**
**Hostile Work Environment**
**(Against the City of Chicago)**

354.     Plaintiff re-alleges the preceding paragraphs and incorporates them as though fully set forth herein.

355.     A hostile work environment based on sex, including physical or verbal unwelcome sexual conduct by an individual of a *quid pro quo* nature or that has the purpose or effect of creating an intimidating, hostile, or offensive work environment, is actionable under Title VII.

356.     The City failed to take proper preventative, corrective, or remedial action to protect Plaintiff from sexual harassment and a sex-based hostile work environment or to remedy the harassment and environment she suffered.

357.     The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

358.     As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits,

employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XVII
### Illinois Human Rights Act, 775 ILCS 5/6-101
### Retaliation
### (Against the City of Chicago)

359.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

360.    The Illinois Human Rights Act makes it unlawful for an employer to discriminate or retaliate against any employee because she has opposed any unlawful employment practice or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing pursuant to the IHRA.

361.    By its conduct as alleged herein, the City discriminated and retaliated against Plaintiff for exercising her rights under the IHRA.

362.    The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

363.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XVIII
### Illinois Civil Rights Act, 740 ILCS 23/5
### (Against the City of Chicago)

364.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

342.    By its conduct as alleged herein, the City subjected Plaintiff to discrimination on

the basis of her sex, in violation of 740 ILCS 23/5.

343.    The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

365.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XIX
### Illinois Whistleblower Act, 740 ILCS 174, *et seq.*
### (Against the City of Chicago)

362.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as if fully set forth herein.

363.    The Illinois Whistleblower Act, 740 ILCS 174/15, states that an employer may not retaliate against an employee for disclosing or threatening to disclose information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.

364.    The Illinois Whistleblower Act, 740 ILCS 174/20.1 states that "Any other act or omission not otherwise specifically set forth in this Act, whether within or without the workplace, also constitutes retaliation by an employer under this Act if the act or omission would be materially adverse to a reasonable employee and is because of the employee disclosing or attempting to disclose public corruption or wrongdoing."

365.    By its conduct as alleged herein, Defendant City of Chicago intentionally retaliated against Plaintiff in response to her disclosures of Marco Torres's unlawful conduct and Defendant City of Chicago's unlawful refusals to remedy Torres's unlawful misconduct.

344.    The City's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

345.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

**COUNT XX**
**Negligent Supervision**
**(Against the City of Chicago)**

366.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

367.    Defendant City of Chicago had a duty of care to adequately supervise its employees, including Marco Torres, in order to protect other employees and third persons from harm.

368.    By its conduct as alleged herein, Defendant City of Chicago had actual or constructive notice, knew, or reasonably should have known, that Torres had a particular unfitness for his position with the City so as to cause danger of harm to other employees or to third persons.

369.    By its conduct as alleged herein, Defendant City of Chicago failed to adequately supervise Torres, even when Defendant City of Chicago knew or reasonably should have known that Torres was engaging in conduct that could and did, in fact, cause harm and injury to others, including Plaintiff, and has thereby expressly authorized the harm he inflicted.

370.    Defendant City of Chicago acted recklessly and/or willfully and wantonly and otherwise demonstrated an utter indifference to, or conscious disregard for, Plaintiff's safety and other rights.

371.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XXI
### Negligent Retention
### (Against the City of Chicago)

372.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

373.    Defendant City of Chicago had a duty of care in determining whether to retain its employees.

374.    By its conduct as alleged herein, Defendant City of Chicago had actual or constructive notice, knew, or reasonably should have known, at the time that it chose to retain him as an employee, that Torres had a particular unfitness for his position with the City so as to cause danger of harm to other employees or to third persons.

375.    By its conduct as alleged herein, Defendant City of Chicago negligently retained Torres, who was unfit because he had engaged in repeated misconduct that resulted in harm to others, including Plaintiff.

376.    Defendant City of Chicago acted recklessly and/or willfully and wantonly and otherwise demonstrated an utter indifference to, or conscious disregard for, Plaintiff's safety and other rights.

377.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits,

employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XXII
### Illinois Gender Violence Act, 740 ILCS 82, *et seq.*
### (Against all Defendants)

378.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

379.    By the conduct as alleged herein, Defendants violated the Illinois Gender Violence Act by repeatedly condoning, and thereby encouraging and assisting, Torres's violence acts toward Plaintiff.

380.    Defendants had an affirmative duty to protect Plaintiff from foreseeable harm, including harm from Torres.

381.    Given Torres's past violence against other female employees and Plaintiff, Defendants knew or should have known that he posed a continued threat of harm, including to Plaintiff, and Defendants had an affirmative duty to control Torres, and to warn Plaintiff in a way that would have enabled her to avoid harm.

382.    Defendants failed to take any corrective measures to control Torres or to warn Plaintiff in any way that would have enabled her to avoid harm from Torres, and instead, vested Torres with the ability to continue harming others, including Plaintiff, without consequence.

383.    Defendants' conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's rights.

384.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits,

employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XXIII
**Assault**
**(Against the City of Chicago)**

385. Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

386. Defendant City of Chicago knew or should have known of Torres's past misconduct but chose to retain him without consequence, thereby expressly authorizing the misconduct.

387. By failing to take action against Torres and protect Plaintiff, the City subjected Plaintiff to Torres's repeated threats against her, including to her life, which caused Plaintiff to be in great fear and reasonable apprehension of imminent harmful and offensive contact from Torres.

388. Defendant City of Chicago had the authority to discipline and discharge Torres yet failed to do so or to otherwise exercise reasonable care in the supervision and retention of Torres in a manner that could have prevented Plaintiff's apprehension of an imminent harmful and offensive contact.

389. Defendant's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's constitutional rights.

390. As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XXIV
### Battery
### (Against the City of Chicago)

391.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

392.    Defendant City of Chicago knew or should have known of Torres's past misconduct but chose to retain him without consequence, thereby expressly authorizing the misconduct.

393.    By failing to take action against Torres and protect Plaintiff, the City subjected Plaintiff to Torres's willful and intentional batteries to Plaintiff.

394.    Defendant City of Chicago had the authority to discipline and discharge Torres yet failed to do so or to otherwise exercise reasonable care in the supervision and retention of Torres in a manner that could have prevented the repeated, willful, and unauthorized physical contact.

395.    Defendant's conduct was willful, wanton, intentional, malicious, and undertaken with deliberate indifference to Plaintiff's constitutional rights.

396.    As a direct and proximate result of the City's unlawful conduct, Plaintiff has suffered damages including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XXV
### Negligent Infliction of Emotional Distress
### (Against all Defendants)

397.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

398.    Defendants had a duty of care to adequately supervise their employees, including Torres, in order to protect other employees and third persons from harm.

399.     Defendants also had a duty of care to protect individuals, including Plaintiff, from foreseeable and avoidable peril.

400.     Defendants' profound failure and refusal to act to address Torres's past and continued misconduct, including after Doe and others made Defendants aware of Torres's violence and threats, is extreme and outrageous.

401.     In abusing Plaintiff, Torres came into direct physical contact with Plaintiff, and Plaintiff suffered physical injuries as the result of Torres's actions, making Plaintiff a direct victim of Defendants' negligence.

402.     By their conduct as alleged herein, Defendants had actual or constructive notice, knew, or reasonably should have known, Torres's actions were causing Plaintiff severe emotional distress, and certainly knew that there was a high probability that his ongoing conduct would cause her severe emotional distress.

403.     By its conduct as alleged herein, Defendants had actual or constructive notice, knew, or reasonably should have known, that Torres had a particular unfitness for his position within the City so as to cause danger of harm to other employees or to third persons, including Plaintiff, but refused to take corrective actions to prevent harm to Plaintiff.

404.     Defendants acted recklessly and/or wantonly and otherwise demonstrated an utter indifference to, or conscious disregard for, Plaintiff's safety and other rights.

405.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

## COUNT XXVI
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

406.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth

herein.

407.    Defendants' actions in refusing to protect Plaintiff and their deliberate and

intentional choice to conceal from Doe a grave threat on her life, leaving her at increased risk of

being murdered, are extreme and outrageous, as are Defendants' refusals to act after learning of

Torres's repeated physical, psychological, and sexual abuse of Plaintiff, refusals to act after

Plaintiff pleaded with them to take action to protect her safety, refusals to obtain video footage

that would reveal the identity of a man who was searching for her at a former residence, and

Defendants' deliberate choice to shield Torres from accountability at Plaintiff's expense and to

seek discipline against Plaintiff arising from statements she made to Defendants as a victim when

she reported Torres's abuse of her.

408.    Defendants intended to cause Plaintiff severe emotional distress, were aware that

both Torres's actions and their actions were causing Plaintiff severe emotional distress, and

certainly knew that there was a high probability that Torres's ongoing conduct and their refusals

to take any action to protect her safety, deliberately placing her in greater danger, would cause her

severe emotional distress.

409.    Defendant City of Chicago and the individual Defendants had the authority to

discipline Torres yet failed to do so or to otherwise exercise reasonable care in the supervision and

retention of Torres in a manner that could have prevented the severe emotional distress suffered

by Plaintiff.

410.    Defendants' conduct was willful, wanton, intentional, malicious, and undertaken

with deliberate indifference to Plaintiff's constitutional rights.

411.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered injuries including but not limited to the loss of compensation, employment benefits, employment and career opportunities, damage to her reputation, severe mental anguish, humiliation, loss of enjoyment of life, fear, anxiety, physical harm, and severe emotional distress.

**COUNT XXVII**
**Indemnification**
**(Against the City of Chicago)**

430.    Plaintiff re-alleges Paragraphs 1-257 and incorporates them as though fully set forth herein.

431.    In committing the acts alleged in the preceding paragraphs, the individual Defendants were acting as agents or employees of the City of Chicago and were working in the course and scope of their employment and under color of law.

432.    In Illinois, public entities are directed to pay any tort judgment for compensatory and other damages for which employees are liable within the scope of their employment activities.

433.    Defendant City of Chicago is the indemnifying entity for the actions described above of the individual Defendants who took their actions while acting under color of law and in the course and scope of their employment with the City of Chicago.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant City of Chicago on Counts I-VII and XV-XXVII and against the Individual Defendants on Counts VIII-XIV, XXII, and XXV-XXVI, and that it:

a)  Declare Defendants' conduct was in violation of the laws as set forth in Counts I - XXVII;

b) Award Plaintiff the value of compensation and benefits she has lost and will continue to lose;

a) Award Plaintiff damages for emotional distress and other compensatory damages she has suffered and will continue to suffer in the future;

b) Award Plaintiff other make whole relief;

c) Award Plaintiff punitive damages from the individual Defendants;

d) Award Plaintiff her reasonable attorney's fees and costs;

e) Pursuant to 745 ILCS 10/9-102, order the City of Chicago to pay any compensatory damages and other available relief on a tort judgment against the individual Defendants for their actions giving rise to the claims asserted against them;

f) Enjoin the City and all officers, agents, employees, and all persons in active concert or participation with them from engaging in any unlawful employment practice;

g) Enjoin the City and all officers, agents, employees, and all persons in active concert or participation with them to institute and carry out all policies and practices to comply with federal and state law to provide equal employment opportunities for all and to prevent discrimination, harassment, and retaliation against women and against whistleblowers; and

h) Award Plaintiff any and all other relief to which she may be entitled as the Court deems just in the premises.


Respectfully submitted,


By:      s/ M. Megan O'Malley
          Attorney for the Plaintiff

M. Megan O'Malley
John P. Madden
Alexandra L. Raynor
Gemma N. Cruz
O'Malley & Madden, P.C.
542 So. Dearborn Street
Suite 660
Chicago, Illinois 60605
(312)697-1382
momalley@ompc-law.com

# Exhibit A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

JCK Federal Building
230 S. Dearborn
Suite 1866 (Enforcement, State and Local & Hearings)
Suite 2920 (Legal & ADR)
Chicago, IL 60604
Website:  www.eeoc.gov

EEOC Charge Number: 440-2023-05919

███████████                                                  Charging Party
c/o Megan O'Malley
O'Malley & Madden, P.C.
524 S Dearborn St Suite 660
Chicago, IL  60605

vs.

City of Chicago                                              Respondent
121 N LaSalle St
Chicago, IL 60602

Chicago Police Department                                    Respondent
████████████████

Chicago Police Department                                    Respondent
███████████

## **DETERMINATION**

Under the authority vested in me by the U.S. Equal Employment Opportunity Commission's ("Commission") Procedural Regulations, I issue the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII).

The Respondents, herein referred to as "Respondent", are employers within the meaning of Title VII, and all requirements for coverage have been met.

The Charging Party alleged that she was discriminated against by Respondent based on her sex, female, and in retaliation for engaging in protected activity, by being harassed and by being forced to transfer to a less favorable assignment, in violation of Title VII.

I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent discriminated against Charging Party based on her sex, female, and in retaliation for engaging in protected activity, by being harassed, by being forced to transfer to a less favorable assignment, and by being denied reassignment, in violation of Title VII.

440-2023-05919
Page 2 of 2

This determination is final. When the Commission finds that violations have occurred, it attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, I invite the parties to join with the Commission in reaching a just resolution of this matter. Anything said or done during the conciliation process will be kept confidential by the Commission and, subject to limited exceptions set out in the Commission's Procedural Regulations (29 CFR Part 1601.26), may not be used by participants in a subsequent proceeding, including litigation on this charge, without the consent of all parties.

If the Respondent wishes to accept this invitation to participate in conciliation efforts, please notify Investigator ███████████████ at ██████████████████████████████ within 14 days. You are encouraged to include proposed terms for a conciliation agreement. The remedies for violations of the statutes we enforce are designed to make the identified victims whole, and to provide corrective and preventative relief. These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of identified victims in positions they would have held but for discriminatory actions, back pay, restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation(s) and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process or the conciliation terms it would like to propose, please contact ██████████████████ at the above email and/or phone number. Should there be no response from the Respondent within 14 days, we may conclude that further conciliation efforts in this matter would be futile or non-productive.

On Behalf of the Commission,

Date    8/18/25

*Amrith Kaur Aakre*
Amrith Kaur Aakre
District Director